and A.K., People v. Kerrison, and for the appellate, we have Mr. Alan Novick, and for the appellate, Luke McNeil. Mr. Novick, are you ready to proceed? Yes, Your Honor. Okay, thank you. I'm not sure I said it, but this is case number 4150050. Thank you. Go ahead, Mr. Novick. Thank you, Your Honor. May it please the Court and Counsel. I asked to chat with you today partially because the facts of the case, and partially ask you to view those facts from the perspective of what I believe is trustworthy social work practice. In an abuse-neglect court, we are at the interface of law and social work, and if each of us does our job, things can work out well. We need to serve the best interest of the child and the purpose of the Juvenile Court Act to secure for that child care and guidance, preferably in his own home. The agency in this case that was doing the social work had the power to do both of these things, and I'm going to suggest to you they didn't do it. When DCFS takes children from their parents and places them in foster care, the social workers begin the assessment process to determine what went wrong and how we fix it. Right after protective custody, right after that shelter care hearing, specially trained social workers begin the integrated assessment process. They try to determine the strengths and weaknesses of the parents, and from there a service plan is developed to re-educate and reform imperfect people with the desired result of getting them to at least meet minimum parenting standards. So that's what we're all holding. I listed a number of facts from the record as an example of the concept, and I'm not sure of my Latin, sui generis. I think these facts you don't see in most of the juvenile termination appeals that you get. This dad completed his service plan, and then some. He had a loving bond with his children, everybody said that. He had sobriety, full-time employment, adequate housing. That's the good news. The kids had been in either seven or nine placements, depending upon whether you count respite, and they'd been physically abused. I would ask you to look at the pictures in the record. Physically abused in foster care, I'm sorry. Please look at them. The injuries did cause Mr. Kerrison to not be a happy camper on more than one occasion. There's no doubt about it. But he never took it out on the children. If you look at the visiting logs, if you're going to fault him, you need to fault him more on the side of being the easy dad than the harsh one. The social work does not stop with the integrated assessment and the service plans. Those plans get evaluated. As you can see from the facts of this case, AK, the eldest child, had some significant behavioral issues. It took the baby folks 16 months to sort this out. They first thought it was autism, and autism is a spectrum, and they figured he was somewhere on that spectrum. But 16 months later, they determined it's more of a sensory processing issue. Mr. Novick? Yes, Ron. Bookmark where you're at, because I don't want you to not remember where to go back to here. But I'm curious about this, the length of time that it took for this case to make its way through, and the nine separate placements, foster home placements. Why did it take so long for it to get to where it finally got? Because where it finally got was Judge Fitzgerald saying permanency is the most important factor here, considering that this is my view of reading the briefs and his comments, that permanency was the most important factor here. It seems like the permanency factor rose to the level that it did because the case had been around for so long, and the kids had been placed in all of these different foster homes. It did. But we can't blame either the parent or the agency for that. As I recall why they kept getting moved, first placement is a relative, has the kids for a while, didn't work out. Second placement is where CK gets his butt whooped. And shortly after that, miraculously, the Department A finds, we're not going to indicate anybody, even though it was with the foster parents at the time, and B, the foster parents said we're giving notice, we don't want these kids anymore. And then we go through a series of other placements while parents are doing services. 16 months, is that a long time? Not in juvenile court, not a terribly long time in juvenile court, it's a little long, but during this time, you know, on the one hand, mom is trying to work through her alcohol issues and fails. Dad works through parenting, domestic violence, substance abuse, and then he, counseling, and then he tries to seek out other resources to prove to the baby foal that he's a fit and proper parent. But of course, counsel, we're dealing with a situation where dad admitted he was unfit. Yes, ma'am. Yes, he did. But as I understand the case law, just because you admit you're unfit, that doesn't terminate your parental rights. Sure, we have a best interest hearing. We still have to go through a best interest hearing, and we now know a few things that I'm not sure all the lawyers were right up against at the time. And that brings us to the three evaluations. You know, I'm trying to explain, it's a rational process, and when we find out the problems, we try to fix them. We get three evaluations that occur. The first is the interim evaluation from Easter Seals. The second is a baby foal counselor, and the third is another, a more detailed evaluation from Easter Seals. What do each of those evaluations say? Each of them says that dad should be made part of the treatment plan process, that dad is, should be allowed to learn about sensory processing disorder, that dad should be part of helping AK get better. What does the baby foal do with that? Nothing. And that's the real problem. If this is going to be a rational process, if I'm going to go back and tell people, do what they tell you to do, and you'll get your kids back, then some responsibility has to be placed on the agency. When the baby foal's own counselor says, let me, I'll just go ahead to, because you asked that, I'll go ahead to that. The second report from December of 13 references that first Easter Seal report. It talks about, first of all, dad's unsuccessful request to have his kid transported to the baby foal for some of his counseling, it was going to be family counseling. Baby foal refused. And they said, okay, you're just going to cram it into the visit, to your relatively limited visiting time. The report says that, this is baby foal's counselor, the report says that dad should be given full opportunity to understand and learn how to address the diagnosis for the older son. It notes the information has been long unavailable. It did take baby foal a while to get Easter Seals to do all the evaluations, and we give up on autism, and we now realize what it really is 16 months later. The parent should be directly involved, particularly in light of modeling as the preferred method of teaching. Mr. Karrison should have access to learning and implementing these important parenting strategies. Increased time should be made available for dad to participate in services with his son. This should be outside of the child parent therapy visitation time, and it never happened. How do we know it never happened? You go back to the service plan. When things change in the case, the service plan changes so that the parent is on notice as to what they have to do. Does the service plan ever change? No. That's the problem. So let me go back to where, I apologize, okay, so the baby foal commissions these evaluations, the recommendations put dad in his rightful position as part of the treatment team. Remember at this point in time the goal is still return home. If you're going to be honest with parents, if you're telling them the goal is return home, then don't lie to them. Don't tell them, don't take the recommendations and not implement them. That's not fair. As a policy matter, as a resource matter, we spent a lot of money on this kid. When you look at those evaluations, in the back of the brief I included all of them. What's interesting is the number of master's degrees and other folks, we've got a developmental pediatrician, two speech language pathologists, an occupational therapist, an autism diagnostic clinical director. We spent big bucks on this. Let's use it. That's all I'm saying. Santosky v. Kramer, the seminal case from the U.S. Supreme Court on what do we do, what burden do we place at the termination stage, also says when the state moves to destroy weakened familial bonds, it must provide parents with fundamentally fair procedures. I like the procedure. I like the integrated assessment, assess them, the service plan, treat them. All we're asking for is follow through. The recommendations were get this dad involved and they blew it off. All right, so I talked about the second report. Let's go back to that first report. This is in November of 13. This is the Easterseal Interim Discipline Evaluation. It recommends incorporating dad in learning ways to teach and modify the behavior of his son. You know, when you look at most of the, you know, there's lots of visitation, lots of visits that are going to occur in a couple of years. You know, you're going to get one a week, you're going to get two hours. They're very well tracked by the agency. That's a good thing. What's the purpose of visits? Let's take what the parent has learned and see if they can apply it. Dad does wonderfully at visitation. You know, as I read the visitation logs, it's like it's my grandmother there because he's constantly cooking for these kids. He's not just giving these kids happy meals or those little snacky things. He's cooking for these kids. I'm surprised they're not overweight. It recommends incorporating the dad. It's important the dad be allowed to work cooperatively with his therapist and the school. One of the things, when Sihan was on the witness stand and they said, the question was something like did you know about all this stuff going on? He said, they never told me when the IEP meetings were. If the goal is return home, you've got to do that. Mr. Novick, I kind of want to follow up on what Judge Harris was asking you about. It's clearly that Judge Fitzgerald emphasized, in fact, made his decision, I think, based upon the need for permanency. And Justice Harris had asked you about why so many placements. I think the response was that the amount of time was not really out of the ordinary because these cases do take time. But the number of placements, I think Justice Harris may have said nine and it may have been maybe seven, whatever, but was it the number of different placements which led Judge Fitzgerald to conclude that permanency was of the utmost importance? And if so, you suggested the amount of time wasn't really unique. How about the number of placements? And is any of the high number of placements, is any of that placed at the feet of your client as far as anything that he may have done wrong? They allege that at one time he caused the placement to fail, one out of nine. And I may be speaking out of turn here, but Judge Fitzgerald always emphasizes permanency above the other factors. And so there's a question that we could talk about is, where does the statute say that one factor is that much more important? Well, clearly this Court has emphasized the need for permanency on many occasions, both in Rule 23 orders and in published opinions. It could very well be that Judge Fitzgerald is relying upon the Fourth District Court in emphasizing permanency so much. Then force the agency to do their job. If the agency has recommendations to incorporate dad, maybe if you got dad into it six or eight months earlier and he learned all about sensory processing disorder, maybe it wouldn't have taken so long. The third evaluation is from March of 2014. This is the occupational therapy evaluation. It is pretty technical because it talks in detail about this sensory processing disorder. AK has a problem processing voices in noisy environments. He needs a calming spot to retreat to, and this is a quote, when his engine is running too high and he needs to calm down. This could be a play tent. Now this is right from the evaluation. What's so ironic about this is, as you read the visitation log, six months before this, I'm going to read it to you, September 17, 2013, dad plays on floor with children, creates a puzzle with them, and then they played in a makeshift tent. Now I don't know if it's common sense or instinct, but six months before this evaluation calms down, dad is doing the right thing because he's using a modality that's recommended by the evaluation. The tent calmed this kid down. Now, we can only, let me say one other thing. While his children is in care, as time went on, Mr. Kerrison did get more and more frustrated. I attribute that in part because they made him live in never never land. Why do I call it that? He never received any satisfactory explanation as to why his kid got bruised. The expert psychologist who favored termination never took the time to see him once with his children. In 30 months, he never heard anything positive from anything at BabyFold. When asked to explain his older child's level of anxiety, he said, I don't know, they never included me in the IEP meetings. There was never any testimony his anger is directed at his kid. There's never any evidence he abused his children. Easter Seals recommends that he be involved in occupational therapy, and it never happened. Easter Seals recommends services to improve AK's emotional regulation, and dad should be taught once a month to have access to these parenting strategies. It never happens. Easter Seals' interdisciplinary report recommends the agency incorporate the parents to teach the child different behaviors. It never happens. Occupational therapy evaluation recommends dad's direct involvement with his son to help problem-solving skills. It never happens. The complaint about Mr. Kerrison from the agency, he's frustrated, he's angry. You betcha. The failures of the agency in Never Never Land should not be allowed to weaken the bond between the parent and child, especially when the goal is return home, because that's not in the best interest of the child. I'm not sure I have a whole lot more, I apologize. Thank you. You'll have rebuttal if you choose to utilize it. Mr. McNeil, are you prepared to proceed? Excellent. Please, the court. Help me. There's only one question that this court needs to answer, and there's only one question that the trial court needed to answer. Usually this is a two-step process involving unfitness and then best interest. Here, as Your Honor pointed out, defendant admitted that he was unfit. Defendant stipulated, I'm sorry, old habit of mine, respondent stipulated that he's unfit. So the trial court only had to look at all of the evidence, the best interest report, all the previous reports, all the testimony at the hearing, looking at it in the child's best interest, A.K. and C.K. here. That's important because respondent, even on appeal, does not admit that the children aren't in a better position with Lori, the foster parent here. Respondent's testimony, even at the best interest hearing, and of course during all of the visits and everything like that, respondent's position had always been adversarial. Of course the DCFS, the department's main contention with respondent, going forward, was his anger problem. Clearly, even respondent's own independent counselor, who he paid independently to observe these visits, Mr. Crutcher, he testified even, he admitted that respondent still had work to do with his anger problem. So, and as Justice Harris and Turner pointed out, permanency was the most important factor here. Especially A.K. had moved around to nine different spots. A.K. had been in care prior to this case. C.K. was still thankfully young enough to not comprehend too much, but A.K. especially needed permanency. He deserved permanency. In this case, Lori was the, which was the foster mother, her last name was not provided. She gave the children the best chance of permanency. She wanted to adopt these kids. She raised, she wanted to, she lived with them as their own. She provided everything they needed. She lived in a big house. They each had their own room. Lori provided the permanency and stability that these children needed. As the trial court correctly noted, permanency was the most important factor here. Defendant, respondent's progress, respondent's situation, his anger management was only, the only concern at this stage was moving forward, whether he could have these kids returned to him in the foreseeable future. Nobody testified that that was the case. The current caseworker testified that it would be at least a year before a respondent would be deemed fit to have these children returned to them. This is the exact opposite of permanency. This is the exact opposite of stability. The standard of review, well the standard of review here is manifest way to the evidence. The state only had to prove by preponderance of the evidence at this hearing that the best interest in the children was for termination. That's obviously a lower standard than what I'm used to to prove beyond a reasonable doubt. Here, Lori was clearly the more permanent, more stable, and best choice for these kids. Mr. McNeil? Yes. After August of 2012, the goal was return home, right? Correct. After the dispositional hearing in August of 2012. And then at what point did it change to termination? I think the petition was filed October? October of 2014? Yes. All right. So during that, let's just call it a two-year period, from August of 2012 to October of 2014. What prevented return home? What was it? Was it dad's anger issues? That was a significant part of it. Respondent had visits during this time. He had many visits with his children during this time. The police were called on two occasions. And there was one specific testimony of a specific outburst where the children were present. Clearly, after an outburst to the level the police should be called, the department is going to view that as obviously a setback in any kind of return home situation. Well, what I'm trying to gather is during this two-year period where the goal is return home, what is it that is preventing the return home? During this period when kids are being placed from foster home to foster home, moved around to where it finally seems makes permanency the paramount concern for the trial court to where, in the best interest of termination, it is determined that they be placed with the foster parent. At the doorstep of the father, is he not doing something that he should have been doing? And I ask, what was the impediment to returning home? And it was his anger management issues. Clearly, that was a contributing factor. There wasn't much testimony as to the history because, quite frankly, that wasn't the primary motive for this hearing. It was for the best interest of the children moving forward. Again, if there wanted to be an indictment on the whole system or something like that, maybe there would be more testimony regarding the quick transfers. To me, it's odd as well that there had been so many placements in just two years. I see a lot of these cases. Does the state dispute that respondent's anger was mostly attributable to the injuries that he saw without any explanation? I mean, we're all judges up here on the bench, and if we see injuries to one of our kids without any explanation, it's pretty reasonable for us to understand how a parent would be quite upset and angry. That's understandable. I think the main problem with the respondent's whole angle to this case was his adversarial approach. He seemed to butt heads with the department. Again, maybe it's understandable, maybe not. He seemed to butt heads with the department at every single turn. Clearly, of course, any reasonable parent would be upset by any abuse to their child. Again, most reasonable parents would probably work quicker to get through the service plan goals at that point. But again, the fitness of respondent was foregone conclusion here. The best interest of the child was what this hearing was about. And to say that the opposite conclusion was clearly apparent here, that termination of respondent's rights and then subsequent adoption by Lori, who testified herself she was willing to adopt these kids and wanted to adopt these kids, to say that the opposite conclusion is clearly apparent, which would need to be the standard here, that would be ludicrous looking at the evidence that was presented at the hearing. Respondent testified as well. The trial court evaluated his credibility. The trial court evaluated the caseworker's credibility.  To say that their findings were error would be wrong in this case. And because it's such a simple question, that's all I have to say unless there are more questions. I see no questions. Thank you very much. And Mr. Novick, do you have any rebuttal? Thank you. With regard to our current foster parent, I'm sure she's a nice lady. But the baby fold is alleging that the kids are bonded to her six weeks after being there. She's my ever mom. Now, that's nice, but in foster home number two, within a month, I want to stay here forever. Okay, so now I'm starting to get the permanency question a little better. Kids do need permanency. I don't doubt that for a minute. But to what extent, I guess, if you look at Santoski, to what extent can we not play fair with dad and then say, too bad, they need permanency, bye-bye? That's the question. Now, we talked about, or counsel talked about anger. And Mr. Kerrison's counselor, Mr. Crutcher, after seeing the pictures of the injuries, he said anyone would be angry seeing these injuries. There is another witness, Miss Biddle, and she comes to watch a visit. And this is long before we know that AK has the sensory issue. And he says, my shoes are a problem, my shoes are a problem. And so whatever foster parent at the time buys him shoes, and they look like clown shoes. They're very big. And dad looks at the shoes and goes, can I take the kid out and buy him some shoes? And they said, we won't let you do that. At that visit, he also sees a huge rash on the back of the child's neck. He takes a picture of the rash, and the caseworker screams at him in front of the children. And he gets angry, and it's his fault now. He tries to document the bruises to CK's butt, and the caseworker screams at him as a visit, at a visit, and it's his fault. Chicken or egg? I'm not sure. But more important, just as important as permanency, is the bond. Barb Schneider, the counselor who does lots of visits, says there's a significant bond between the children and dad. Dr. Zayschen and Dr. Tyler, who did the bonding study, says there's a significant bond. And at page 22 of the brief, I think it's good for a quick quote. As we're doing the bonding study, dad demonstrates good skill in the four categories that the bonding study looks for. Structure, engagement, nurturance, and challenge. Dad approaches the children in a warm and nurturing manner. The children appear to enjoy activities with the father. It just seems to me that we're putting a lot of importance on permanency, and not enough on the bond. Lori has a bond after six weeks like dad's? I don't buy it. And that gets back to one other question. I think Justice Harris said about permanency, and why did it take so long? I would say for the first six months or maybe a year, and I'm just guessing here. Dad tried to save mom. Dad tried to take mom to AA meetings. Dad tried to help her. Why does this case start? Because mom's drunk and she stabs dad. Dad tried to save her. He wanted his family together. It's not a bad idea if it works, but mom had a significant alcohol problem, and it took him a while to realize it was not going to work. Thank you. Okay. Mr. Novick, thank you very much. Mr. McNeil, thank you as well. The case is submitted, and the court stands in recess until further call.